THOMAS F. DALEY, Judge.
| ¡¡Plaintiff, Benjamin Jones, appeals a judgment reflecting a jury verdict that found he was not injured following an accident on February 19, 1999, between the cab he was driving and the truck owned by defendant Werner Enterprises, Inc.
On appeal, Jones argues two Assignments of Error. First, he argues that the jury verdict was manifestly erroneous in finding that he was not injured in the accident, where defendant stipulated to liability, and the medical testimony, including objective testing, clearly showed that it was more likely than not that the accident *778 did cause the plaintiffs injury. Second, Jones argues that the trial judge erred in admitting into evidence the highly prejudicial evidence of plaintiffs past drug use and psychiatric problems in order to contest his ability to work, where Jones had been working continuously for two years prior to the accident. Plaintiff argues that the evidence’s prejudice outweighed its probative value.
After thorough consideration of the record and applicable law, we find that the jury’s verdict was not manifestly erroneous. Further, we find that plaintiff Iswaived his objection to the introduction of the allegedly prejudicial evidence. Accordingly, we affirm the judgment.
The accident occurred on February 19, 1999, when Jones was forty years old. Jones was driving a cab on Airline Highway near Hickory, when an 18 wheeler, owned by defendant, made a wide right turn from the middle lane. The truck made contact with Jones’s cab on the driver’s side door and damaged the cab. Jones claimed that the cab was dragged for about 25 feet. Jones alleged that he was thrown about inside the cab and briefly lost consciousness. Jones did not go to the emergency room on the day of the accident, but on the following day, upon referral from his attorney, saw Dr. Stewart Altman, who had treated him for a previous motor vehicle accident in 1996. Plaintiff allegedly suffered back and neck injuries in the accident. Prior to trial, Werner Enterprises stipulated to liability.
In his first Assignment of Error, Jones argues that five treating physicians, who all treated him for his back and neck symptoms following this accident, testified that plaintiff was injured in this accident. Moreover, he argues, the objective testing, the MRIs, showed that he was injured in this accident. This evidence, however, must be considered in light of the entire record and evidence presented to the jury.
The first doctor who treated Jones for this accident was Dr. Altman, who first saw plaintiff on the day after the accident and treated him until April 9, 1999. Despite the claimed severity of his injuries, plaintiff did not go to the emergency room on the day of the accident, but called his attorney for a referral to Dr. Altman. The jury heard, through Dr. Altman’s video deposition, that 85% of his practice are attorney referrals. He opined that Jones had healed from his 1996 accident. Dr. Altman’s office recommended that Jones attend physical therapy three times per week, but in fact Jones attended therapy five times in two months.
^According to Dr. Altman’s records, a Dr. Gaupp in his office noted on March 31, 1999, that plaintiff was able to return to work. On April 7, 1999, Jones saw Dr. Altman for leg cramps, which Dr. Altman thought might be deep vein thrombosis (DVT), unrelated to the accident. Dr. Altman did not examine Jones’s neck or back at this visit. Dr. Altman wrote Jones a referral to Charity Hospital, where he underwent testing for DVT, which proved to be negative. Jones last saw Dr. Altman on April 9, 1999, but no examination was performed at that visit. According to his records, Dr. Altman recommended that Jones see an orthopedist because of his continued back and neck complaints. His diagnosis of disc disease was based on the plaintiffs complaints, not on the physical examination.
Plaintiff next saw Dr. David Jarrott, a neurosurgeon, on April 12, 1999, at the recommendation of his attorney. Dr. Jar-rott’s testimony and records revealed that Jones failed to tell him about his prior accident in 1996, nor had Jones told him about other incidents several years before this accident where he had allegedly *779 thrown himself out of a moving car in attempts to commit suicide. Dr. Jarrott prescribed Soma, a muscle relaxant, and Lortabs, a narcotic pain medication. Dr. Jarrott also ordered MRIs of the lumbar and cervical spine, which was performed on April 14, 1999. Dr. Jarrott testified that the lumbar MRI showed a degenerative changes at L5-S1, and that the cervical MRI showed a mild bulge at C5-6, which was not abnormal for a man of Jones’s age. The MRI showed no spinal cord compression or deformity.
Dr. Jarrott related plaintiffs symptoms of pain to this accident. However, it is important to note that Dr. Jarrott did not have the plaintiffs complete medical history, because plaintiff omitted mentioning his 1996 accident and the previous suicide attempts. Dr. Jarrott also did not learn of plaintiffs psychiatric history, which included a diagnosis of bipolar disorder sometime around 1994, until later in his treatment of Jones.
Is Jones returned to see Dr. Jarrott on May 9,1999, and obtained more pain medication. He next saw Dr. Jarrott on July 8, 1999, a two month gap in treatment, and obtained more pain medication. An examination on this date showed no neurological deficit, some muscle and ligamentous tenderness in the spine, with a slightly limited range of motion. Dr. Jarrott concluded that the cervical problem was a soft tissue problem. After another two month gap in treatment, Jones again saw Dr. Jarrott on September 20, 1999, and obtained more pain medication.
In between visits to Dr. Jarrott, plaintiff saw Dr. Michael Haydel, a chiropractor, receiving chiropractic treatments on July 15 and July 20, 1999. Jones testified that the treatments caused him greater pain, so he did not return.
Also during this time, on August 3, 1999, Jones applied for Social Security disability again, claiming that he was totally disabled due to his bipolar condition,[1] as well as his back and neck pain. This second application was denied.
The jury watched a surveillance videotape of plaintiff taken on August 7, 1999, several days after the second application for disability was made. This tape shows Jones performing physical activity that his disability application alleged he was unable to do, such as putting an ice chest into the trunk of his car, carrying a heavy chain, driving and turning his neck to see while he was backing out of the driveway, other moderate lifting, and carrying garbage bags while wearing an unhooked back brace. The same videotape shows Jones driving a car, bending at the waist, carrying a lawn chair, and cleaning out the garage for over an hour.
The record shows that in connection with his application for disability, Jones underwent a psychological evaluation on October 18, 1999. The psychiatrist noted that Jones reported taking cocaine until three years before the application, and that | fihe was not able to manage his funds because of a chronic gambling problem. This second application for disability was rejected on October 27,1999.
Plaintiff returned to Dr. Jarrott on January 26, 2000, after a four month gap in treatment. Jones continued to complain of low back pain, neck pain, headaches, weakness in both legs and pain in both hands.
After eight months without treatment, Jones saw Dr. Bartholomew, a neurosurgeon, on September 19, 2000. Jones gave *780 Dr. Bartholomew an incomplete medical history, failing to tell him about the suicide attempts, the 1996 accident, or a more recent March 2000 motor vehicle accident. An examination revealed normal reflexes, a normal range of motion in the back, but with reports of pain, no spasm, positive straight leg raising test, and some numbness in the left big toe. In the neck, there was no tenderness, no spasm, and a normal range of motion. Dr. Bartholomew reviewed the April 1999 MRIs and diagnosed degenerative changes at C4-5 and C5-6, and a herniated disc at L5-S1. At the time, Dr. Bartholomew felt that a lumbar discogram, a diagnostic test to determine the origin of disc pain, would be beneficial, since Jones’s complaints of back pain seemed to be worse than his complaints of neck pain. However, Dr. Bartholomew wrote a prescription for a cervical discogram instead. The procedure, however, was not performed until nearly a year later, by Dr. Charles Aprill, a radiologist, on August 7, 2001.
Eleven months passed between Jones’s first and second visits to Dr. Bartholomew. During that time, Jones applied a third time for disability status, claiming he was disabled from back, neck, leg and arm pain, bipolar disorder, five injured discs, and deafness in one ear. He claimed that he could not walk, bend, or stoop. This application was denied on September 20, 2001. Jones appealed this denial, and on July 12, 2002, plaintiff was found disabled under the [Social Security] Act and Regulations.
l7Pr. Bartholomew next saw plaintiff on August 28, 2001, which was three weeks after the discogram was performed by Dr. Aprill. Dr. Bartholomew’s records indicate that plaintiffs complaints of pain were again “very bad” and that he wanted to have surgery. However, surgery had not been approved. Plaintiff saw Dr. Bartholomew again on October 11, 2001, with complaints of worsening pain. Plaintiffs next visit to Dr. Bartholomew was on September 5, 2003, where he complained of worse pain, but where a physical examination revealed normal strength in his arms and legs. Plaintiffs last visit to Dr. Bartholomew was on April 13, 2004. The doctor explained the gaps in treatment by noting he was a surgeon, and since surgery had not been approved, there was little he could offer Mr. Jones by way of treatment.
On cross examination, Dr. Bartholomew acknowledged that he first saw Jones one year and seven months after the 1999 accident, and that he based his opinion about causation upon the history as related by the plaintiff. The doctor admitted that it appeared plaintiff did not give him a complete history, because he omitted mention of the suicide attempts, the 1996 accident, or 2000 subsequent accident. He was also unaware of plaintiffs psychiatric history. He noted that he knew nothing of any treatment plaintiff might have had during gaps in his treatment. Dr. Bartholomew felt that plaintiff could perform sedentary employment or employment where he could change positions frequently.
The jury heard from Jones himself, who testified at length. They heard that Jones had a history of drug abuse around 1991— 1992, when he abused cocaine. He testified that he had entered drug treatment programs several times. Jones testified regarding his employment history. His earliest employment was running a bar known as Benny’s that was originally owned by a family member. During that time, Jones developed a habit of cocaine abuse. He testified that the bar was “shut down” by the effect of hostile city ordinances.
IsJones testified that he had been drug free while he was employed at Bunny Bread in 1993, introducing into evidence a *781 negative drag screen performed in May of 1993, but this was refuted on cross examination when Jones was confronted with evidence of a later positive drug test performed while he worked for Bunny Bread. Jones was fired from Bunny Bread, but specifically denied this on his application with Glazer, his next place of employment, claiming that he resigned from Bunny.
Jones worked at Glazer for two years, starting in the warehouse, but ending as a delivery driver. He was fired after he got angry at a delivery, took the loaded truck, and got drunk at a barroom. He pleaded guilty to criminal charges stemming from this incident, but claimed that Glazer offered him his job back if he wanted it upon completion of his probation. This assertion is refuted by employment records from Glazer, which state that Jones would not be offered his job back.
The jury heard Jones’s complaints of pain and his reported limitations of his activities, both in his testimony and his many applications for disability, yet also saw two surveillance videotapes, one from August of 1999 and one from December of 2002, that show him engaging in substantially more physical activity than he claimed to be able to perform. In the 1999 tape, Jones wears a back brace unhooked while cleaning out a garage. He is seen lifting boxes and garbage bags. Later in the tape, Jones drives a car, and looks behind him while backing the car out of the driveway. The jury also heard Jones deny the accuracy of his records from his treatment for drug dependency and depression at Charity Hospital.
Dr. Charles Aprill, the radiologist who performed the discogram on Jones on August 7, 2001, testified that the purpose of the discogram was to determine the source of the pain in the discs. His records indicate that Jones reported a pain level of 8 out of 10, but he felt that Jones’s actions weren’t consistent with pain of that reported magnitude. He testified that there are both objective and subjective | components of this test. He explained that a thin needle is inserted into each disc and a contrast agent is injected, which is viewed through fluoroscopy to determine if the discs have any bulging, which is an objective finding. If the disc is a source of pain, the patient will report pain, which is a subjective finding, but that this pain will depart when he injects anesthetic into the disc. Jones reported a higher level of pain after the anesthetic was injected, which Dr. Aprill called a nonphysiological response.
The jury heard the videotaped deposition of Dr. Deepak Awasthi, a neurosurgeon, who performed an independent medical examination of Jones on October 11, 2001. He took a medical history from Jones, reviewed his MRI films from April of 1999, and performed a physical examination of plaintiff. Jones told Dr. Awasthi about the 1996 accident, but failed to tell him about the suicide attempts. Dr. Awasthi’s physical examination showed no neurological deficits, good motor strength, normal reflexes, and no muscle atrophy. Dr. Awasthi opined that the MRI films showed mild degenerative changes in the affected discs that were very likely present at the time of the accident, but no nerve root compression. Dr. Awasthi testified that disc protrusion, which the MRI showed, was not the same thing as nerve impingement. He felt that at the most, plaintiff would have experienced mild to moderate lumbar and cervical sprains at the time of the accident, and that surgery was not warranted.
Looking at the evidence as a whole, it is clear that plaintiff gave an incomplete and inaccurate medical history to his treating physicians. He neglected to mention all of his previous accidents to several treating *782 doctors, and in most cases neglected to mention his psychiatric history. The objective testing, the MRIs performed in 1999, which plaintiff claims show he was injured in this accident, were interpreted by several doctors, as outlined above, as showing mild degenerative changes, and no nerve root compression or spinal cord compression, 11nthat were most likely present before this accident. Plaintiffs various physical examinations, such as the one performed by Dr. Awasthi, which showed no neurological deficit and normal strength and reflexes, were not consistent with Jones’s complaints of pain or claims of disability.
The jury heard that Jones claimed to suffer from disabling pain from this accident, yet has not availed himself of any treatment at Charity Hospital, a health care institution that he has nevertheless turned to for other health needs, such as drug treatment, mental health care, and testing for suspected DVT in 1999. The jury heard that despite the claimed severity of the accident, plaintiff did not seek treatment at any emergency room on the day of the accident, instead waiting to seek any treatment until the next day when his attorney referred him to Dr. Altman. Finally, the jury heard plaintiffs claims of severe pain and disability, yet viewed two surveillance tapes that showed plaintiff engaging in at least moderate physical labor, which plaintiff claimed to be unable to do.
Plaintiffs Assignment of Error mischaracterizes the nature of the doctors’ testimonies and their interpretations of the objective testing, given that plaintiff failed to give complete and accurate medical histories to those doctors, and that his complaints of pain were subjective and not supported by the objective findings in the physical examinations. Also, the jury did not hear this evidence in a vacuum; they also heard the inconsistencies in plaintiffs testimony and saw the surveillance videotapes. We cannot say that the jury was manifestly erroneous in concluding that plaintiff failed to prove that he was injured in this accident. The factual findings of a jury are accorded great weight and will not be disturbed on appeal absent manifest error. Stobart v. State, through DOTD, 617 So.2d 880 (La.1993).
Plaintiff argues next that the trial court erred in allowing the introduction of evidence of his past drug use, arguing that the prejudicial nature of this evidence outweighed its probative value.
| n Originally, plaintiff filed a Motion in Limine to keep out evidence of his prior drug abuse, psychological history, and criminal conviction, arguing that it was embarrassing, prejudicial, and not probative. The Motion was argued on the first day of trial, August 15, 2005. The trial court denied the Motion, ruling that the information was relevant to the plaintiffs credibility and the loss of wage claim. The plaintiff filed an expedited Application for Supervisory Writs with this Court on the next day, August 16. This Court denied the application the same day, finding that the trial court was within its discretion in allowing this evidence to be introduced.
As defendant points out, however, in opening statements on August 15, prior to the writ being filed and a ruling from this Court, plaintiff counsel himself mentioned the past drug abuse, the psychiatric history, and specifically the bipolar diagnosis, and the plaintiffs conviction stemming from the incident at Glazer. Any objection plaintiff may have had to the introduction of this evidence was thereby waived.[2]
*783 Accordingly, we affirm the judgment of the trial court.

AFFIRMED.

. The record reveals that in 1994, Jones applied for Social Security disability, claiming that the bipolar disorder rendered him totally disabled and unable to work. This application was made after he was fired from his job with Bunny Bread for excessive absenteeism.

. Defendant further argues that this Court’s ruling became "law of the case” and should not be revisited on appeal. Given that plaintiff waived his objection by inclusion of this *783 information in opening statements, we do not reach this argument.